UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DIXIE D. BOOTH,                          )
                                         )
            Plaintiff,                   )
                                         )
     vs.                                 )          Case No. 4:11CV941 CDP
                                         )
MICHAEL J. ASTRUE,                       )
Commissioner of Social Security,         )
                                         )
            Defendant.                   )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Dixie Booth's application for disability

insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, *et*

*seq.* Claimant Booth brings this action asserting that she is disabled because of

bipolar disorder, anxiety disorder, post-traumatic stress disorder, attention deficit

disorder, diabetes, spinal stenosis, osteoarthritis, carpal tunnel syndrome, atrial

dysfunction, diverticuluitis, colon surgery, and glaucoma. The relevant time

period for consideration of Booth's claim is from August 1, 2007, the alleged

onset date, through December 31, 2007, the date her insured status expired.[1]

_____

[1]To meet the requirements for insured status, an individual is required to have 20 quarters
of coverage in a 40-quarter period ending with the first quarter of disability. See 42 U.S.C. §§
416(i)(3)(B) and 423(c)(1)(B); 20 C.F.R. § 404.130. To be entitled to benefits under Title II
Booth must establish that she was disabled before the date her insured status expired, which is
December 31, 2007.

Because I find that the decision denying benefits was supported by substantial evidence, I will affirm the decision.

## Procedural History

On February 28, 2008, Dixie Booth filed for disability insurance benefits alleging an onset date of January 1, 2001. The Social Security Administration denied Booth's application at the initial level, and she filed a timely request for a hearing on her claim. Booth appeared and testified at a hearing on September 1, 2009. At the hearing, Booth amended her alleged onset date to August 1, 2007. Following the hearing, the ALJ received and considered additional evidence.

The ALJ issued an opinion on February 12, 2010 upholding the denial of benefits. He found that Booth's only severe impairments were degenerative knee joint disease, early diabetic neuropathy, and carpal tunnel syndrome. The ALJ dismissed Booth's allegations as to atrial dysfunction and glaucoma because they were not supported by the medical record. He found that Booth's allegation of diverticulitis failed the twelve-month durational requirement, and her spinal stenosis was not severe. The ALJ further concluded that Booth did not have a severe mental impairment during the relevant period because the medical record showed no episodes of decompensation, no more than mild restrictions of activities of daily living, and no more than mild difficulties maintaining social functioning, concentration, persistence, and pace.

On November 16, 2010, the Appeals Council of the Social Security Administration denied Booth's request for review. Accordingly, the ALJ's determination stands as the Commissioner's final determination. Booth filed this request for review on May 24, 2011. Booth does not challenge the ALJ's findings regarding her physical impairments, but rather limits her challenge to two issues: whether the ALJ erred in finding that Booth's mental impairments were not severe during the insured period, and whether the ALJ committed reversible error by failing to obtain vocational expert testimony.

## Testimony Before the ALJ

At the time of the administrative hearing, Booth was forty-eight years old and lived with her husband. She had the equivalent of a high school education. Booth stated that she did not work at the time of the hearing. The last job she remembered having was at Standard Machine, but she could not recall the date. Booth testified that she had health coverage through her husband's employment until his retirement at the end of 2007.

Booth testified that she had spinal stenosis, bone degenerative disease, and diabetes. She further stated that she needed a knee replacement, and suffered from carpal tunnel syndrome. She cites her carpal tunnel syndrome as the reason she quit her last job. Booth testified to having neuropathy in her feet, arterial dysfunction in the left artery of her heart, and diverticulosis.

Regarding her psychiatric condition, Booth stated that she had suicidal thoughts and occasionally heard voices. She also testified to having panic attacks which could occur anywhere from six times a month to twice a week. Booth also testified to having manic episodes, during one of which she choked her husband. Regular behavior during her manic episodes also included breaking things and crying. Booth testified to having been raped four times between the ages of nine and sixteen, which she believes caused her to have a fear of people. Booth also stated that in 2007 she had a problem with binge spending which she believes to have resulted from her taking Cymbalta. Booth testified to experiencing additional side effects from her various medications, including shaking, dry mouth, and hoarseness.

Booth stated that when her carpal tunnel syndrome was flaring up she could not grip or turn a doorknob. Due to the neuropathy in her feet, Booth testified that her feet would go numb, especially if she crossed her legs, and that the numbness would go away if she held her feet off the ground. Booth also stated that she stayed in her bedroom for two years, had been afraid to leave the house, and "can't be around people." She testified to taking Xanax for anxiety. Booth said she was supposed to take Xanax three times a day, and took them if she was leaving the house and knew she would be around people.

## Medical Records

On August 24, 2000, Booth saw Sandra S. Hoffman, a general practitioner. Booth was on Effexor and Xanax, but reported feeling moody and at times suicidal. Dr. Hoffman prescribed Celexa. On September 6, 2000, Booth returned to Dr. Hoffman and again reported depression. Booth saw Dr. Hoffman on March 3, 2003, and complained of fatigue and depression. Dr. Hoffman prescribed Protonix, Lexapro, and Flagyl. On April 23, 2003, Booth returned to Dr. Hoffman for a routine physical. Dr. Hoffman noted that Booth showed a poor memory and was emotionally overwhelmed. She further noted that Booth reported having stopped taking her medications partway through treatment.

In February of 2006, Booth reported to Dr. Puckett on multiple occasions that she suffered from anxiety and insomnia. In August of 2006, Booth was anxious and suffering from panic attacks. Adjustments were made to her medications.

On June 5, 2007, Booth saw Renee Amato, PA (under the supervision of Dr. James C. Speiser) on a referral. She reported pain in all of her joints and numbness in her hands and feet. Amato noted no clear signs of rheumatoid arthritis, though there was some indication of carpal syndrome, mild degenerative joint disease, and osteoarthritis. Booth returned to Amato on July 17, 2007. She

received bilateral knee injections and was encouraged to wear wrist splints, though she declined carpal tunnel injections.

On August 13, 2007, Booth saw Deborah A. Depew, D.O. Dr. Depew noted that Booth was taking Xanax for her chronic anxiety disorder and that she complained of insomnia. Dr. Depew prescribed an increase in Alprazolam and ordered Booth to continue taking Cymbalta. Booth had x-rays taken on October 2, 2007, which showed early diabetic neuropathy but were otherwise unremarkable. On October 3, 2007, Dr. Depew again noted that Booth suffered from anxiety/depression, but had not been taking her medications.[2]

On November 1, 2007, Booth saw Dr. Depew for an evaluation regarding her upcoming breast reduction. No psychiatric problems were noted. On December 4, 2007, Booth returned to Dr. Depew for a diabetes check. Booth reported that she had a history with bipolar affective disorder and had been irritable. Booth had previously been on Cymbalta and was amenable to restarting

---

[2]During the insured period, Booth had doctor and hospital visits for various physical impairments. She was hospitalized from August 1 to August 7, 2007, with acute sigmoid diverticulitis. On September 5, 2007, Gregory W. Brabbee, MD performed a laparoscopic anterior colon resection with mobilization of the splenic flexure, partial omentectomy. She was discharged on September 8, 2007, at which point she was already showing signs of improvement. On September 25, 2007, Booth visited the St. John's Mercy Emergency Room complaining of chest and abdominal pain, but her condition was not deemed to be serious.

On October 2, 2007, Booth complained of numbness in her feet, and was diagnosed with early diabetic neuropathy. On November 7, 2007, Booth underwent a breast reduction. On December 18, 2007, Booth saw Amato for bilateral knee pain. She also complained of pain and numbness in her hands and a new pain in her feet. She was diagnosed with degenerative joint disease in her knees, bilateral carpal tunnel syndrome, and bilateral foot pain. She was given bilateral knee injections and oral pain medication.

it, but had concerns because it caused her to go on a spending spree. Dr. Depew prescribed Abilify and referred her to psychiatry.

On December 10, 2007, Booth had undergone a psychosocial evaluation at Psych Care Consultants. The doctor noted that Booth's current medications included Lithium, Trazodone, Adderall, Xanax, and Gabapentin. She was diagnosed with PTSD, biopolar affective disorder, and attention deficit disorder, and described as "very labile." The doctor noted that Booth was not suicidal nor had homicidal ideation, though mentioned having had thoughts of suicide in the past. Her global functioning was assessed at 60. Booth returned to Psych Care Consultants on December 20, 2007, and the doctor noted that her mood was improving. She made monthly follow-ups with Psych Care Consultants through March of 2008.

Booth returned to Dr. Depew again on February 27, 2008. Booth had not filled the Abilify prescription, but had seen a psychiatrist who prescribed Lexapro, Adderall, Lithium, and Trazodone. Booth reported that she was manic and had problems with overspending, but Dr. Depew noted that she was not suicidal nor had plans or ideation regarding suicide. On May 13, 2008, Booth reported to be doing well with no complaints or problems. She was taken off a lot of her medications and noted improvement, including with her anxiety.

On April 15, 2008, Dr. Stotler noted that Booth had bipolar disorder and a current GAF of 58, whereas her highest GAF in the past year was 66. Booth was in the process of changing psychiatrists because she had gained 30 pounds and did not feel like her medications were working. She reported poor sleep, manic episodes including shopping sprees, uncontrollable panic attacks in public, and anxiety and depression. On May 23, 2008, Booth saw James C. Speiser, MD for a follow up appointment for neuropathy and degenerative arthritis in her lumbar spine. Dr. Speiser also noted that Booth had changed psychiatrists because she felt that the medications her old doctor was giving her were causing her to gain weight. Dr. Speiser further noted that Booth's new doctor prescribed Seroquel, and that Booth seemed to be doing better on that medication.

Booth returned to Dr. Stotler on May 27, 2008, and complained of being tired and lethargic despite sleeping well. Dr. Stotler noted that Xanax helped with Booth's social anxiety, but that she also suffered from depression. She was not suicidal at the time. On July 28, 2008, Dr. Stotler noted that Booth was sleeping 10 hours and felt rested and that her mood was stable but depressed. He further noted that she was not suicidal, had logical and sequential flow of thought, and good judgment and insight.

Booth also began seeing Cathi Mueller, LPC on June 12, 2008. At her initial consultation, Ms. Mueller noted that Booth had anxiety, manic episodes,

panic attacks, and a current GAF of 54. On June 23, 2008, Ms. Mueller noted that Booth was not suicidal, though she had a depressed mood and sad affect, and GAF of 53. Similar observations were made at a July 10, 2008 appointment. On July 24, 2008, Ms. Mueller noted that Booth was doing "much better," having a good mood, bright affect, and GAF of 65. Ms. Mueller noted that Booth was still doing well at their August 7, 2008 appointment, with a GAF of 65. On September 25, 2008, Ms. Mueller noted that Booth was very depressed, felt suicidal, and had a GAF of 40.

On September 25, 2008, Booth presented to St. John's Mercy Medical for psychiatric inpatient admission. Her affect was labile, she was irritable, and she admitted suicidal ideation with multiple plans but no intent. Upon discharge, she was diagnosed with bipolar disorder and chronic psychiatric illness, and had a GAF of 55. At that time she denied suicidal or homicidal ideation, plan, or intent, and felt she was stable to be transitioned to outpatient treatment on October 1, 2008.

On October 13, 2008, Ms. Mueller completed an assessment for Booth's social security disability claim. Ms. Mueller listed Booth's diagnoses as bipolar affective disorder, PTSD, and personality disorder, and opined that Booth's extreme anxiety and social phobia could be paralyzing at times, resulting in a diminished capacity to maintain full-time employment.

On October 14, 2008, Booth saw Dr. Patterson, who noted that she was bipolar and appeared to be mildly schizophrenic. Dr. Patterson stated that Booth was not homicidal or suicidal, but he felt that she would go down hill rapidly.

Dr. Stotler completed an assessment on October 23, 2008 for Booth's social security disability claim. He noted that she suffered from ADD, depression, and anxiety in the past, and gave a current diagnosis of bipolar disorder. Dr. Stotler assigned Booth a GAF score of 30 at the time of her hospitalization, and a 48 otherwise, and concluded that she could not work in her present state.

Booth was still depressed at an October 30, 2008 visit to Ms. Mueller, but her GAF had increased to 50. That same day, Dr. Stotler noted that Booth had been hospitalized, was depressed, and had daily suicidal ideation, but with no intent. Her GAF was 48. On November 10, 2008, Booth's GAF was 56, and Ms. Mueller described her mood as good. Booth saw Dr. Stotler on November 26, 2008, where he noted that Abilify was helpful for her and she felt she could reduce her Xanax usage. She had an okay mood and GAF of 54. On February 19, 2009, Dr. Stotler noted that Booth was depressed and crying with poor sleep. Her GAF was 58. On April 16, 2009, Dr. Stotler noted that Booth had irritability, mood swings, and fatigue, although her sleep was okay and her mood had been good.

The ALJ referred Booth to take the Minnesota Multiphasic Personality Inventory-2, which was administered by Carmen Curtis, PhD, on October 19,

2009.  After conducting the test and interviewing Booth, Dr. Curtis concluded that her MMPI-2 results were invalid because she presented herself as having an exaggerated level of psychopathy.  Dr. Curtis also evaluated Booth in four areas of daily functioning.  He concluded that she had moderate impairment of her activities of daily living, moderate to severe impairment of social functioning, mild impairment of appearance and ability to care for personal needs, and moderate impairment of concentration, persistence, and pace.

## Legal Standard

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001).  Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the ALJ's conclusion.  *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000).  As long as there is substantial evidence on the record as a whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, *id.*, or because the court would have decided the case differently.  *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992).  In determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's

decision as well as evidence that supports it."  *Singh v. Apfel*, 222 F.3d 448, 451

(8th Cir. 200) (citation omitted).

To determine whether the decision is supported by substantial evidence, the

Court is required to review the administrative record as a whole to consider:

(1)     the credibility findings made by the Administrative Law Judge;

(2)     the education, background, work history, and age of the
claimant;

(3)     the medical evidence from treating and consulting physicians;

(4)     the plaintiff's subjective complaints relating to exertional and
non-exertional impairments;

(5)     any corroboration by third parties of the plaintiff's impairments;
and

(6)     the testimony of vocational experts when required which is
based upon a proper hypothetical question.

*Brand v. Secretary of Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th

Cir. 1980).

Disability is defined in the social security regulations as the inability to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than twelve

months.  42 U.S.C. § 416(i)(l); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. §§

404.1505(a) and 416.905(a).  In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five-step procedure.

First, the Commissioner must decide if the claimant is engaging in substantial gainful activity.  If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities.  If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his past relevant work.  If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy.  If not, the Commissioner declares the claimant disabled.  20 C.F.R. §§ 404.1520 and 416.920.

When evaluating evidence of subjective complaints, the ALJ is never free to ignore the subjective testimony of the claimant, even if it is uncorroborated by objective medical evidence. *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. *See, e.g., Battles v. Sullivan*, 992 F.2d 657, 660 (8th Cir. 1990). In considering the subjective complaints, the ALJ is required to consider the factors set out by *Polaski v. Hecler*, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1. the claimant's daily activities;
>
> 2. the duration, frequency, and intensity of the pain;
>
> 3. precipitating and aggravating factors;
>
> 4. dosage, effectiveness and side effects of medication;
>
> 5. functional restrictions.

*Id.* at 1322. When an ALJ explicitly finds that the claimant's testimony is not credible and gives good reasons for the findings, the court will usually defer to the ALJ's findings. *Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir. 2007). The ALJ retains the responsibility of developing a full and fair record in the non-adversarial

administrative proceeding. *Hildebrand v. Barnhart*, 302 F.3d 836 838 (8th Cir. 2002).

A treating physician's opinion should ordinarily not be disregarded and is entitled to substantial weight. *Singh*, 222 F.3d at 451. A treating physician's opinion concerning a claimant's impairment will be granted controlling weight if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. *Id.* While a treating physician's opinion is usually entitled to great weight, the Eighth Circuit has cautioned that an opinion "do[es] not automatically control, since the record must be evaluated as a whole." *Prosch*, 201 F.3d at 1013.

The Eighth Circuit has upheld an ALJ's decision to discount or disregard the opinion of a treating physician in situations in which other medical assessments "are supported by better or more thorough medical evidence" or in which a treating physician gives inconsistent opinions that undermine the credibility of the opinions. *Id.* (quoting *Rogers v. Chater*, 118 F.3d 600, 602 (8th Cir. 1997)). In any event, whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations require the ALJ to "always give good reasons" for the particular weight the ALJ chooses to give the opinion. *Singh*, 222 F.3d at 452; *Prosch*, 201 F.3d at 1013; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

# The ALJ's Findings

The ALJ found that Booth did not suffer from a disability within the meaning of the Social Security Act at any time from August 1, 2007 through December 31, 2007. He issued the following specific findings:

1.    The claimant met the insured status requirements of the Social Security Act on August 1, 2007, but she was no longer insured after December 31, 2007.

2.    The claimant did not engage in substantial gainful activity during the August 1 to December 31, 2007 period. 20 CFR 404.1520(b) and 404.1571 *et seq*.

3.    The claimant had the following severe impairments during the August 1 to December 31, 2007 period: degenerative knee joint disease, early diabetic neuropathy, and carpal tunnel syndrome. 20 CFR 404.1520(c).

4.    The claimant's condition did not meet or medically equal a listing in 20 CFR Part 404, Subpart P, Appendix 1 during the period in question. 20 CFR 404.1520(d), 404.1525, and 404.1526.

5.    From August 1 through December 31, 2007, the claimant had the residual functional capacity to lift or carry twenty pounds occasionally and ten pounds frequently, sit six hours in an eight-hour day and stand and/or walk a total of six hours in an eight-hour day. This constitutes a full range of light work.

6.    The claimant was unable to perform her past relevant work during the August 1 to December 31, 2007 period. 20 CFR 404.1565.

7.    The claimant was forty-six years old during the period in question (in regulatory parlance, a younger individual). 20 CFR 404.1563.

8.    The claimant had the equivalent of a high school education during the period in question. 20 CFR 404.1564.

9. Transferability of skills is not an issue because the claimant's past relevant work was unskilled in nature. 20 CFR 404.1568.

10. A significant number of jobs existed for the claimant in the national economy during the August 1 to December 31, 2007 period. 20 CFR 404.1560(c) and 404.1566.

11. The claimant was not disabled in accordance with the Social Security Act during the August 1 to December 31, 2007 period. 20 CFR 404.1520(g).

The ALJ determined that Booth did not have a severe mental impairment during the relevant period. The ALJ noted that Booth's only mental health treatment during the period from August to December of 2007 was psychotropic medication and two visits to psychiatrists. Further, the ALJ concluded that the psychiatrist's initial evaluation of Booth's status had unremarkable results, save for a labile affect. The ALJ also noted that Booth's psychiatrist noted improvement through January of 2008, and that evaluations by physicians in late 2008 had unremarkable results. The ALJ thus concluded that for the August to December 2007 period, Booth had no episodes of decompensation, no more than mild restrictions of activities of daily living, and no more than mild difficulties maintaining social functioning, concentration, persistence, and pace. Regarding Booth's records from 2008, the ALJ discounted the opinions of Dr. Stotler and Cathi Mueller because neither had a relationship with Booth during the relevant

period and further concluded that their assessments were contradicted by their treatment notes.

## Discussion

When reviewing a denial of Social Security benefits, a court cannot reverse an ALJ's decision simply because the court may have reached a different outcome, or because substantial evidence might support a different outcome. *Jones ex rel. Morris v. Barnhard*, 315 F.3d 974, 977 (8th Cir. 2003); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). Instead, the court's task is a narrow one: to determine whether there is substantial evidence on the record as a whole to support the ALJ's decision. 42 U.S.C. § 405(g); *Estes v. Barnhard*, 275 F.3d 722, 724 (8th Cir. 2002). On appeal, Booth raises two issues. First, she argues that the ALJ erred in finding that Booth's mental impairments were not severe during the insured period.[3] Second, she argues that the ALJ committed reversible error by failing to obtain vocational expert testimony. Because I find that the ALJ's decision as to both issues was supported by substantial evidence, I will affirm the decision.

### Booth's Mental Impairments Were Not Severe

"In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status." *Pyland v. Apfel*,

---

[3]Booth also argues that the ALJ should have called a medical expert "if the onset was in question." However, Booth herself amended the onset date to August 1, 2007. Furthermore, as discussed more fully below, the ALJ's finding that Booth's mental impairments were not severe prior to that date are supported by substantial evidence in the record.

149 F.3d 873, 876 (8th Cir. 1998); 42 U.S.C. §§ 416(i), 423 (c). Booth alleged an onset date of August 1, 2007, and her insured status expired on December 31, 2007. Booth argues that the ALJ erred in finding that Booth's mental disorders were not severe during the relevant period, and that they had merely "mild" effect on Booth's ability to work. In so concluding, the ALJ noted that Booth's only mental health treatment during the insured period was psychotropic medication and two visits to psychiatrists. Booth relies on medical evidence from both before and after the insured period to bolster her argument.

The ALJ's finding that there was not a severe mental impairment during the relevant period is supported by substantial evidence. "The absence of any evidence of ongoing counseling or psychiatric treatment or of deterioration or change in [claimant's] mental capabilities disfavors a finding of disability." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (citing *Dixon v. Sullivan*, 905 F.2d 237, 238 (8th Cir. 1990)). As the ALJ noted, there is very little evidence of mental health treatment from August 1, 2007 to December 31, 2007. During this time, Booth saw Dr. Depew a number of times for non-mental health issues. Dr. Depew noted Booth's reports of anxiety and panic attacks, but did not document any serious issues and merely made adjustments to Booth's various psychotropic medications.

Booth underwent a psychosocial evaluation with Psych Care Consultants on December 10, 2007, where she was diagnosed with PTSD, bipolar affective

disorder, and attention deficit disorder, and described as "very labile." Nonetheless, the doctor noted that Booth was not suicidal, had a GAF of 60, and at a return visit ten days later was already showing signs of improvement. Further improvements were noted at visits to Psych Care Consultants through the beginning of 2008. There is thus sufficient evidence to support the ALJ's finding that Booth did not suffer a severe mental impairment that would significantly limit basic work activities.

Booth argues that the ALJ ignored Dr. Stotler's 2008 notation that Booth had a "long history of depression and anxiety," and the medical records showing evidence of such impairments. However, any evidence that Booth was treated or diagnosed prior to the alleged disability onset date does not necessarily support a finding that she met or equaled the listings during the insured period. *See Trenary v. Bowen*, 898 F.2d 1361, 1364 (8th Cir. 1990). The records from 2000 to 2006 show that although Booth complained of anxiety and depression to various physicians and was prescribed psychotropic medication, these visits were sporadic and never included treatment by psychiatrists.

Regarding medical evidence concerning Booth's condition after the expiration of her insured status, the Eighth Circuit has reached varying conclusions as to the relevance of such evidence. *Compare Davidson v. Astrue*, 501 F.3d 987 (8th Cir. 2007) (citing *Rehder v. Apfel*, 205 F.3d 1056, 1061 (8th Cir. 2000) (holding

that report by non-treating psychologist fourteen months after relevant time period was not probative)) *with Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984) (holding that subsequent evidence may bear upon the severity of the claimant's condition before the expiration of her insured status). Here, Booth argues that the ALJ erred in failing to properly consider the medical opinions of Dr. Stotler and Cathi Mueller. The ALJ gave these opinions "virtually no weight" because neither individual had a relationship with Booth prior to the expiration of her insured status. The ALJ further noted that their assessments would be unpersuasive even if relevant because they are contradicted by the treatment notes of both.

Booth began seeing Dr. Stotler in April 2008, when he noted that she had bipolar disorder and a GAF of 58. Booth returned to Dr. Stotler in May and July of 2008, and he noted that she was sleeping well, had a stable mood, and was not suicidal. Booth began seeing Cathi Mueller in June of 2008. At various visits between June and August of 2008, Ms. Mueller assigned Booth GAF scores ranging from 53 at their lowest to 65 at their highest. On September 25, 2008, Ms. Mueller noted that Booth was depressed, felt suicidal, and had a GAF of 40. That same day Booth presented to St. John's Mercy Medical. In October of 2008, both Ms. Mueller and Dr. Stotler completed assessments for Booth's social security disability claim. Both noted her multiple mental health diagnoses, and concluded that she had a complete inability to work.

Because Dr. Stotler and Ms. Mueller treated Booth continuously and beginning shortly after the expiration of her insured status, their opinions are relevant. *See Basinger*, 725 F.2d at 1169. However, the ALJ's finding to the contrary constitutes harmless error, since it is clear that he would not have decided differently even absent the error. *See Van Vickle v. Astrue*, 539 F.3d 825, 830 (8th Cir. 2008). The ALJ noted that even if the opinions were relevant, they would be unpersuasive because they are contradicted by Dr. Stotler and Ms. Mueller's treatment notes. This conclusion is supported by substantial evidence. The medical record indicates that Booth's condition remained relatively stable through the summer of 2008. Although Dr. Stotler and Ms. Mueller noted various levels of anxiety and depression during this period, she was not suicidal and her GAF scores typically placed her in the mildly impaired category. Although the surveys completed by both in October of 2008 indicate severe restrictions for Booth, even their own notes do not began to show serious decline until late September of 2008. The ALJ is supported by the evidence, therefore, in finding that these records do not show severe impairment in Booth during the insured period.

Finally, the ALJ's finding that Booth was not wholly credible is also supported by substantial evidence. "A claimant's subjective complaints may be discounted if there are inconsistencies in the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 789, 801-02 (8th Cir. 2005) (citing 20 C.F.R. § 404.1529).

"A failure to follow a recommended course of treatment also weighs against a claimant's credibility." *Id.* at 802. Records from the insured period show that Booth had stopped taking her prescribed medications. Furthermore, her claims were generally inconsistent with the medical records, as well as with her own testimony regarding her daily activities and abilities. For the foregoing reasons, I conclude that the ALJ's findings were supported by substantial evidence on the record.

<u>The ALJ Did Not Error by Failing to Obtain Vocational Expert Testimony</u>

Booth argues that the ALJ erred by not obtaining testimony from a vocational expert in light of Booth's nonexertional impairments. There is a general rule that "If a claimant has a nonexertional impairment, the Guidelines and grid are not controlling and cannot be used to direct a conclusion of disabled or not disabled without regard to other evidence such as vocational testimony." *McCoy v. Schweiker*, 683 F.2d 1138, 1148 (8th Cir. 1982) (abrogated on other grounds). However, the Eighth Circuit has parsed out nuanced exceptions to this rule where "The ALJ finds, and the record supports the finding, that the nonexertional impairments do not *significantly* diminish the claimant's RFC to perform the full range of activities listed in the guidelines." *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012) (quoting *Reed v. Sullivan*, 988 F.2d 812, 816 (8th Cir. 1993)).

The application of this exception is further determined by the specific nonexertional impairment being considered. Where the extent of the nonexertional

limitation depends on the credibility of subjective testimony about pain, the ALJ may rely solely on the Guidelines under the exception because pain is closely related to the claimant's exertional ability. *Brock*, 674 F.3d at 1065 (citing *Wheeler v. Sullivan*, 888 F.2d 1233, 1238-89 (8th Cir. 1989)). However, a vocational expert is required when the ALJ has determined that the claimant suffers from severe mental impairments, because "a claimant with a severe mental impairment . . . may be incapable of holding any job, even if the claimant's body is sound." *Id.* (quoting *Wheeler*, 888 F.2d at 1238-89). Where an ALJ has determined that a claimant's mental impairment is non-severe, however, it may be appropriate for the ALJ to rely upon the Guidelines. *McGeorge v. Barnhart*, 321 F.3d 766, 769 (8th Cir. 2003).

Here, Booth argues that her pain and mental impairments constitute nonexertional impairments that require the testimony of a vocational expert. The Eighth Circuit precedent dictates otherwise. First, the ALJ determined that Booth's mental impairment was not severe and did not significantly diminish Booth's RFC during the insured period, a determination that is supported by substantial evidence as discussed more fully above. Therefore, it was appropriate for the ALJ to rely on the Guidelines even in light of Booth's mental impairments. *See McGeorge*, 321 F.3d at 766.

Furthermore, the Eighth Circuit has made clear that the ALJ may rely solely on the Guidelines where the extent of the nonexertional limitation depends on the

credibility of subjective testimony about pain. The ALJ discounted Booth's credibility in reporting her alleged pain, and as discussed partly above, this conclusion was supported by substantial evidence on the record. The ALJ noted inconsistences within Booth's own testimony regarding her pain and the types of activities she could complete, inconsistencies between her testimony and the medical records, a poor work ethic, and drug and alcohol use. *See, e.g., Van Vickle v. Astrue,* at 828 (ALJ may discount claimant's subjective complaints if there are inconsistencies in record as a whole); *Pelkey v. Barnhart,* 433 F.3d 575, 578-79 (8th Cir. 2006) (credibility can be discounted based on reported daily activities). The ALJ noted that although Booth suffered from degenerative joint disease, early diabetic neuropathy, and carpal tunnel syndrome, exams by treating physicians showed only a mild degree of carpal tunnel syndrome and isolated abnormalities in reflex, grip strength, and sensation.

The ALJ's credibility determination was based on valid reasons. *See Pirtle v. Astrue,* 479 F.3d 931, 935 (8th Cir. 2007) (quoting *Gregg v. Barnhart,* 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination.")). The ALJ's determination that Booth's nonexertional impairments did not significantly diminish Booth's RFC was thus supported by substantial evidence on the record.

For the reasons discussed above, I find that the decision denying benefits was supported by substantial evidence, and I will affirm the ALJ's decision.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner denying benefits is affirmed.

A separate judgment in accord with this Memorandum and Order is entered this date.


CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 26th day of September, 2012.